IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


LUIS A. RODRIGUEZ,

        Plaintiff,

vs.                                       CASE NO. 1:09-cv-240-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income benefits. ("SSI".) (Docs. 1 and 2). The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 12 and 17.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on November 30, 2006, alleging a disability onset date of February 15, 2006 (R. 112, 116, 144) because of Bipolar disorder and problems getting along with others. (R. 144.) Plaintiff's applications were denied initially (R. 56-58, 59-61) and upon reconsideration. (R. 63-64, 65-67.) Plaintiff requested a hearing before an administrative law judge (ALJ), who conducted hearings

on October 20, 2008 (R. 41-47) and on January 5, 2009. (R. 25-40.)  On April 13, 2009,

the ALJ issued an unfavorable decision.  (R. 9-11.)  The Appeals Council denied

Plaintiff's request for review (R. 1-3), thus, making the ALJ's decision the final decision

of the Commissioner.  On November 13, 2009, Plaintiff filed the instant appeal of the

Commissioner's final decision to this Court.  (Doc. 1).

## II. <u>FINDINGS OF THE ALJ</u>

The ALJ made the following findings:

1.  The claimant will continue to meet the insured status requirements of the

Social Security Act through December 31, 2010. (R. 17.)

2.  The claimant has not engaged in substantial gainful activity since February

15, 2006, the alleged onset date.  (R. 17.)

The ALJ found the claimant's part-time work as a laundry presser did not rise to

the level of substantial gainful activity. (R. 17.)[1]

3.  The claimant has the following severe impairments: affective disorder, anxiety

disorder, and personality disorder. (R. 17.)

4.  The claimant does not have an impairment or combination of impairments

that meets the listings. (R. 18.)

5.  The claimant has the residual functional capacity (RFC) to perform medium

---

[1] The Social Security Administration also found Claimant's part-time work below
was not substantial gainful activity (SGA) level. (R. 121, 219-28).  The earnings
guidelines, after the year 2000, are described in 20 C.F.R. § 404.1574(b)(ii)(2).  Gross
earnings over $900 a month, in 2007, would have shown that Claimant was engaged in
substantial gainful activity. However, Claimant earned only $6,744.51 ($562.04/month)
in 2007. (R.131).  At the time the Social Security Administration made its determination
that Claimant's earnings did not rise to the level of SGA, the Claimant was making, on
average, $824.03/ month.

work as defined in 20 CFR 404.1567(c) and 416.967(c). He is able to lift/carry/push/pull up to 50 pounds occasionally and 25 pounds frequently. He is able to stand/walk for at least a total of six hours per workday. He is able to sit for at least a total of six hours per workday. He is able to perform low-stress work that requires completion of simple, repetitive tasks and no contact with the general public. (R. 19.)

6. After giving Claimant the benefit of the doubt, the ALJ found the claimant is capable[2] of performing past relevant work as a packer/receiver/stocker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (R. 23.)

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 15, 2006 through the date of this decision. (R. 24).

## III. ISSUES PRESENTED

Plaintiff argues that the ALJ erred by ignoring the opinion of Dr. Jose Llinas, Plaintiff's treating physician (psychiatrist), who opined that Plaintiff has almost no ability to perform work activities because of his bipolar disorder.

## IV. STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court. The Commissioner's decision must be affirmed if it is supported by substantial evidence and

---

[2] This appears to be a mistake or typographical error in the decision. Although the heading in section 6 of the written decision states that claimant is "incapable" of performing past relevant work, in the discussion of the issue the ALJ clearly found Plaintiff could perform his past relevant work and therefore was not disabled.

*No. 1:09cv240-MP-GRJ*

the correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a preponderance.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence supports the findings of the Commissioner.  See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact, his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to provide the reviewing court with an adequate basis for it to determine whether proper legal principles have been observed requires reversal.  Id. (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps, commonly referred to as the "five step sequential analysis":

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.  Plaintiff bears the burden of establishing a severe impairment that keeps her from performing his past work.  If Plaintiff establishes that her impairment keeps her from her past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986);

MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, Plaintiff must prove that she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

## V. SUMMARY OF RECORD EVIDENCE

### A.    Personal and Work History

Plaintiff was born on November 20, 1965, and was forty-three years old at the time of the hearing.  (R. 25, 28.)  He has past relevant work experience as a packer/receiver/stocker.  (R. 166-73.)  Plaintiff reported he attended Eastern District High School  in Brooklyn, New York but did not complete twelfth grade because he did not want to keep studying. (R. 28-29.)  He reported he did not earn a GED.  (R. 28).  Plaintiff stated he could "more or less" read and write in English, but could not generally understand a newspaper article and sometimes had trouble understanding restaurant menus. (R. 29.)  He reported he could read and write in Spanish. (R. 29).  Plaintiff moved to Florida from Massachusetts in 2001. (R. 34).

Plaintiff has been working a part-time job, as a laundry press, beginning June 6, 2007. (R. 29-30, 121-22, 219-28.)  He reported working three to four hours a day, at nine dollars an hour, four days a week. (R. 30-31.)  While Plaintiff is scheduled to work five days a week, he stated he does not go to work when he does not feel well.  (R. 31.)

Plaintiff reported this is not a problem because the owner knows his condition and the

owner is friends with his brother. (R. 31.).  According to Plaintiff, sometimes, he also

leaves work early, when his co-workers talk to him, because he gets a temper and does

not feel like talking to anyone. (R. 32.)

### B.    Medical History

#### 1.    *Mental Impairments*

Plaintiff alleges disability beginning February 15, 2006, due to bipolar disorder

and trouble getting along with others. (R. 144.)  Specifically, Plaintiff claims he is

forgetful, constantly angry, hears threatening hallucinations when he is not medicated,

has daily enduring anxiety attacks which make him want to kill people and himself, is

excessively drowsy because of his medications, and not able to sleep at night. (R. 62,

69, 147, 150, 151, 152-54, 183, 188, 189, 214,  215.)

Plaintiff  explained that once he wakes up and takes his medicine he cannot do

much of anything because of the drowsiness. (R. 62, 150.)  He explained he cannot

shop, do chores or yard work, drive, go outside, or handle money because he is

constantly drowsy. (R. 152-54.) Additionally, Plaintiff reported he is limited with regard

to lifting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair

climbing, seeing, memory, completing tasks, concentration, understanding, following

instructions, using hands, and getting along with others, because of drowsiness. (R.

155). Plaintiff generally reported no significant side effects of his medications and being

100% medication compliant to his treating physicians at Meridian. (R. 306, 308, 312,

315, 316, 317, 318, 319, 320, 321, 322.) However, while some of the treatment notes contain Plaintiff's report of zero side effects from medications, some of the notes disclose Plaintiff had insomnia with medication. (R. 321.)

The medical records include records from Meridian Behavioral Healthcare, Inc. ("Meridian"),[3] a consultative examination by Dr. Linda Abeles, licensed psychologist, (R. 260-62), a mental RFC and psychiatric review technique performed by Val Bee, Psy.D., (R. 263-66, 267-80), a psychiatric review technique by Dr. Gary Buffone, Ph.D. (R. 281-94), and Dr. Llinas'[4] Medical Opinion Regarding the Ability to do Work-Related Activities (Mental) ("the Assessment"). (R. 295-98.)

Meridian Treatment Notes

Plaintiff's records disclose that he treated with Meridian from September 12, 2006 through October 8, 2008. On September 12, 2006, Plaintiff's first day of treatment, a psychiatric evaluation and a medication management appointment were conducted. (R. 248-49, 254-57, 258-59.) Plaintiff was diagnosed with bipolar disorder

---

[3] (R. 244-45, 246-47, 248-49, 250-51, 252-53, 254-57, 258-59, 299-300, 301-02, 303-04, 305-06, 307-08, 309-10, 311-12, 313-14, 315-16, 317-18, 319-20, 321-22, 323-26). These records are largely illegible.

[4] Dr. Llinas is the psychiatrist Plaintiff met with at Meridian between September 12, 2006 and May 25, 2007. Plaintiff continued treatment at Meridian with Drs. Stowell and Speisman between July 20, 2007- December 27, 2007 and March 26, 2008- October 8, 2008, respectively.

NOS, nicotine addiction, rule out MDD and GAD.[5] (R. 257.). Plaintiff's GAF score[6] was sixty and his prognosis was fair. (R. 257.)  His psychiatric evaluation noted he was a married Puerto Rican male with "little or no English," and a history of depression, anxiety, mood swings, and irritability.  (R. 254, 256.).  Plaintiff had poor appearance, appropriate manner, retarded motor behavior, grossly intact cognition, anxious mood, "ok" thought process, poor insight, and fair judgment. (R. 256.)

Plaintiff advised that the reasons he sought treatment at Meridian was because he bad nerves and he needed medication to control the problem. (R. 254.) He reported he previously lived in New York and New Jersey and was treated by a psychiatrist there for two years. (R. 254).  Plaintiff was not taking any medications at the time of this visit. He denied substance abuse, and admitted he smoked three packs of cigarettes a day for his nerves. (R. 255.)

On November 20, 2006, Plaintiff returned to Meridian for a medication management appointment. (R. 246-47, 252-53).  Plaintiff reported Zyprexa[7] helped at first but then he got some other medication. (R. 247, 253.)  Dr. Llinas noted Plaintiff had

---

[5] Major Depressive Disorder (MDD) and Generalized Anxiety Disorder (GAD).

[6] A Global Assessment of Functioning (GAF) score of 51-60 is indicative of moderate symptoms or moderate difficulty in social occupation, or school functioning. DSM-IV-TR 34.

[7] Zyprexa (Olanzapine) is an atypical antipsychotic used to treat schizophrenia symptoms and bipolar disorder.  This medication is in tablet form and has side effects of drowsiness, difficulty falling or staying asleep, restlessness, depression, unusual behavior, etc. PubMed Health, Olanzapine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000161 (Last visited Nov. 4, 2010).

fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, "ok" thought process, poor insight, and fair judgment. (R.247, 253.) It was noted that Plaintiff did not express homicide or suicide ideation. (R.247, 253.) Plaintiff's progress was rated at seven out of ten. (R.247, 253.)

On December 15, 2006, Plaintiff met with Dr. Llinas for a medical management appointment. (R. 244, 250.) Dr. Llinas noted Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, and no homicide or suicide ideation. (R. 245, 251). His progress was rated as an eight out of ten. (R. 245, 251)

On March 28, 2007, Plaintiff returned to Meridian for a medication management appointment and Treatment Plan Reassessment and Update. (R. 313-14, 321-22.) Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, no homicide or suicide ideation, and fair judgment and insight. (R. 314.) His progress was nine out of ten. (R. 314.) Plaintiff reported no side effects from medication, although he reported he was still depressed and had mood swings "all the time." (R. 321.) He further reported that his sleep was poor while taking Zyprexa; thinking about hurting himself daily (crashing the car into a wall); talking to himself; and hearing threatening auditory hallucinations. (R. 321.) At this visit, it was noted that Plaintiff was directed to begin taking Abilify[8] as he was tapered off Zyprexa. (R. 321.)

---

[8] Abilify(Aripiprazole) is an atypical antipsychotic used to treat schizophrenia symptoms and mania in bipolar patients. This medication is available in a variety of mediums. Side effects include drowsiness and nervousness. PubMed Health, Aripiprazole, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221 (Last visited Nov. 4, 2010).

Plaintiff's behavior and symptoms were listed as "depressed mood, mood wings, irritability, insomnia [with] meds." (R. 321.)  His GAF score was 60. (R. 321.)

On April 25, 2007, Plaintiff returned to Meridian for a medication management appointment. (R. 311-12.)  He had fair appearance, appropriate manner, normal motor behavior, and grossly intact cognition. (R. 312.)  Plaintiff's progress was noted as nine out of ten. (R. 312.)

On May 25, 2007, Plaintiff returned to Meridian for a medication management appointment. (R. 309-10.)  Plaintiff had good ADL appearance, appropriate manner, normal motor behavior, grossly intact cognition, stable but anxious mood, restricted affect, paranoid thought process, no suicide or homicide ideation, and poor insight and judgment. (R. 310).  His diagnosis was Bipolar Affective Disorder (BAD). (R. 310). Because he reported side effects from Seroquel[9] it was discontinued. (R. 310.)

On July 20, 2007, Plaintiff returned to Meridian for a medication management appointment. (R. 307-08.)  Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, euthymic[10] mood, appropriate affect, no homicide or suicide ideation, and poor insight and judgment. (R. 308.).  The  diagnosis was BAD and Plaintiff's progress was noted as good.   (R. 308.)

_____

[9] Seroquel (Quetiapine) is a medication used to treat symptoms of schizophrenia and mania in people with bipolar disorder.  The medication is in the form of an extended release tablet.  Side effects include, among others,  drowsiness, irritability, and difficulty thinking or concentrating.  PubMed Health, Quetiapine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (Last visited Nov. 4, 2010).

[10] Euthymia is a moderation of mood, not manic or depressed. STEDMAN'S MEDICAL DICTIONARY 141440 (27th ed. 2000).

On September 14, 2007, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. (R. 303-04, 319-20.)  Plaintiff had good ADL appearance, appropriate manner, normal motor behavior, grossly intact cognition, and mildly paranoid thought process. (R. 304.) Plaintiff was diagnosed with bipolar disorder and his progress was noted as good. (R. 304.)  In the Treatment Plan Reassessment and Update, Plaintiff reported being 100% medication compliant with no significant symptoms or side effects.  (R. 319.)  Plaintiff reported less suicidal thoughts and decreased depression since his last appointment. (R. 319.)  He reported auditory hallucinations but an inability to hear what was being said because the sounds were so low. (R. 319.)  Plaintiff's wife reported he talks to himself and that he was unaware of this behavior. (R. 319.)  He reported having continued difficulty sleeping. Plaintiff's GAF score was 60. (R. 319.)

On December 27, 2007, Plaintiff returned to Meridian for a medication management appointment.  (R. 305-06.).  The notes disclose that Plaintiff was stable on medication. (R. 306.)  Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, stable mood and affect, no homicide or suicide ideation, and fair judgment and insight. (R. 306.).  Plaintiff's progress was noted as a nine out of ten. (R. 306.)  At this appointment Zyprexa was reduced and Abilify was increased. (R. 306.)

On March 26, 2008, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. (R. 301-02, 317-18.)

The progress notes evidence Plaintiff denied any side effects, suicide or homicide ideation, substance abuse, and reported his sleep was good with medications. (R. 302.) He reported lacking motivation at times, but had zero mood swings and zero irritability. (R. 302). He had good ADL appearance, appropriate manner, normal motor behavior, grossly intact cognition, mild dysphoric[11] mood, pleasant affect, coherent and relevant thought process, and fair insight and judgment. (R. 302.) Plaintiff's progress was noted as a seven-eight out of ten. (R. 302.) Plaintiff reported in the March 28, 2008 Treatment Plan Reassessment and Update positive progress toward goals from previous appointments, 100% medication compliance, decrease in mood swings, no recent auditory hallucinations, manageable depression, and a lack of suicide and homicide ideation. (R. 317.) The Reassessment and Update evidences Plaintiff's strength in his access to healthcare, his need to continue employment, his ability to make his needs known, his preference to continue treatment, and his challenge of depressed moods. (R. 317.) Plaintiff's GAF score was reported again to be 60. (R. 317.)

On October 8, 2008, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. On this visit Plaintiff reported hearing voices in the last two months, more than in the past. (R. 300.). He reported his sleep was good. (R. 300.) Plaintiff had good ADL appearance,

---

[11] "A mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." STEDMAN'S MEDICAL DICTIONARY 122240 (27th ed 2000).

appropriate manner, normal motor behavior, grossly intact cognition, depressed mood, anxious affect, coherent and relevant thought process with auditory hallucinations and paranoia, no homicide or suicide ideation, and fair insight and judgment. (R. 300.) Plaintiff's diagnosis was psychotic disorder, rule out bipolar disorder. (R. 300.) Plaintiff's progress was rated at five of ten. (R. 300.) The Treatment Plan Reassessment and Update disclose that Plaintiff had made minimal progress toward his goals from his last appointment. (R. 315.) Plaintiff reported having zero side effects from medication. (R. 315.) Plaintiff also reported poor sleeping patterns and poor appetite. (R. 315.) It was noted that Plaintiff's hallucinations had reoccurred, although Plaintiff denied suicide or homicide ideation. (R. 315.) At this visit, Zyprexa was decreased and Plaintiff began taking Invega.[12] (R. 315.) Plaintiff's diagnosis was psychotic disorder NOS accompanied by auditory hallucinations, anxiousness and tenseness. (R. 315.) Plaintiff's GAF score was 55. (R. 315.)

Dr. Abeles, Dr. Bee, and Dr. Buffone, State Examiners

On February 6, 2007, Dr. Linda Abeles, a licensed psychologist, clinically interviewed and administered a mental status evaluation to Plaintiff. (R. 264-66.). Dr. Abeles noted that Plaintiff had been diagnosed with bipolar disorder NOS and was

---

[12] Invega (Paliperidone)is an atypical antipsychotic used to treat schizophrenia symptoms. This medication is in the form of an extended-release tablet. Extreme tiredness is a side effect of this medication. PubMed Health, Paliperidone, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000356 (Last visited Nov. 4, 2010).

taking Zyprexa and Lithium.[13] (R. 264.)  However, she stated, "there seems little

evidence for an Axis I disorder."  Plaintiff reported that his mother and father had a

history of mental problems. (R. 264.)  Plaintiff denied learning problems. (R. 264.)  Dr.

Abeles noted Plaintiff had "been the recipient of outpatient mental health treatment

services only and specifically a history of inpatient psychiatric hospitalization is denied."

(R. 265.)  Plaintiff repeatedly denied performing any type of chore due to the effect of

his current medication regime which causes him to sleep excessively. (R. 265.).  Dr.

Abeles noted that while Plaintiff had a valid driver's license, he could not drive because

of his medications. (R. 261.)  She found his vision, hearing and gait were all within

acceptable limits. (R. 261.) Dr. Abeles noted Plaintiff had a Spanish accent that was

hard to understand fully at times. (R. 261.) She also noted that Plaintiff exhibited a "lack

of effort"[14] and the evaluation results were, therefore, not considered totally valid. (R.

---

[13] Lithium is used to treat episodes of mania in people with bipolar disorder.  This medication comes in many forms including liquid.  Side effects of Lithium include restlessness and poor appetite.  Tiredness is considered a serious side effect which should be reported to a doctor immediately.  PubMed Health, Lithium, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531 (Last visited Nov. 4, 2010).

[14] She noted:

Mr. Rodriguez presented himself as disoriented, misnaming both the year and the month.  When asked the date, he turned to his mother and asked in Spanish for the answer.  The claimant also stated that he did not know the name of the president of the United States.  He was able to count from one to ten.  The claimant's responses to questions designed to assess his judgment abilities suggest an asocial orientation.  For example, when asked, "What is the thing to do if you find an envelope in the street that is sealed, addressed and has a new stamp on it?" he responded, "Nothing.  I don't pick it up."  The claimant professed to be unaware of why people wash clothing and when asked, "What is the thing to do if while at the

261.)  Dr. Abeles concluded Plaintiff's current presentation was consistent with antisocial personality disorder.   She added that "[c]onsideration might want to be given to referring the Claimant for an intellectual evaluation with a Spanish-speaking psychologist." (R. 262.)  She recommended that Plaintiff be referred to the Office of Vocational Rehabilitation to assist him in obtaining suitable employment. (R. 262.)  She found Plaintiff was marginally competent to manage monies in which he may be entitled. (R.262.) Dr. Abeles concluded that Plaintiff's future success in the workplace was fair given his current presentation. (R. 262.)

On February 6, 2007, Val Bee, Psy. D., completed a mental RFC assessment of Plaintiff.  Dr. Bee found Plaintiff not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain a regular attendance, and be punctual within customary tolerances; sustain an ordinary routine

---

movies you are the first person to see a fire?" He responded, "I run out." The claimant could not perform any of the concept formation exercises. When asked the similarities between a fork and spoon, he responded, "yeah" (How are a fork and a spoon the same?) To which he responded, "No." The claimant could repeat only three numbers forward and recall only one out of three words at a five minute delay.  Mr. Rodriguez reported experiencing feelings of depression when he forgets to take his medication and also reported experiencing auditory hallucinations manifested as voices indicating that everyone wants to kill him.  He also reported experiencing neurovegetative disturbances in appetite and sleep, in that he requires medication to sleep.  It is interesting to not that earlier in the interview, the claimant reported that he is unable to perform any type of household chore because he sleeps excessively.

(R. 261).

without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions. (R. 263.. Dr. Bee found Plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 263.) She found Plaintiff's social interaction was not significantly limited and his adaptation was not significantly limited but for Plaintiff's moderately limited ability to set realistic goals or make plans independently of others. (R. 264.) Dr. Bee concluded by stating "[m]ood symptoms and medication side effects may hinder detailed learning and cause occasional lapses in concentration and productivity, but claimant appears mentally capable of well structured task activity and at least superficially appropriate social interaction. May benefit from support with suitable goal setting." (R. 265.)

Dr. Bee also completed a psychiatric review technique on February 6, 2007. In the PRT, she based the Plaintiff's medical disposition on affective disorders, anxiety-related disorders, and personality disorders. (R. 267.) Dr. Bee noted no episodes of decompensation, each of extended duration, moderate limitation in maintaining concentration, persistence or pace, and mild limitation in restriction of activities of daily living and maintaining social functioning. (R. 277.) Additionally Dr. Bee noted that

> ADLs allege claimant is unable to do virtually anything because of 'drowsiness' [and] [a]ssessment of this claim cannot be rendered at this

time. Handwritten notes from treatment source are largely illegible, and mental status information consists of check marks and single word descriptors. Also, ADLs in file admit to almost no functional capabilities, a level of impairment that appears to exceed that which is shown in treatment records. Detailed mental status information is needed.

(R. 279.) Dr. Bee's review of Dr. Abeles' notes reiterates Plaintiff's poor effort, as Plaintiff presented himself as unable to answer basic questions such as the year or the president, as well as his lack of understanding for why people wash clothes. (R. 279.) Dr. Bee noted the inconsistency between needing medication to sleep and the inability to do anything but sleep. (R. 279.) She noted that an intellectual evaluation was suggested, but educational and vocational history were not consistent with mental retardation. (R. 279.) Dr. Bee concluded that "[p]ersuasive evidence of a mental impairment that meets or equals listing requirements is not seen at this time." (R. 279.)

On April 4, 2007, Dr. Gary Buffone, Ph.D., completed a psychiatric review technique. He found Plaintiff's impairments were not severe. (R. 281.) The medical disposition was based on schizophrenic, paranoid and other psychotic disorders, and personality disorders. (R. 281.) Dr. Buffone noted that Plaintiff did not have any episodes of decompensation, each of extended duration, and only had mild limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 291). Dr. Buffone noted a concern for the "numerous inconsistencies" and concluded that "overall MER suggest mild limitations w[ith] no evidence of a severe mental impairment." (R. 293.)

<u>Dr. Llinas' Assessment</u>

On November 25, 2008, Dr. Llinas completed a Medical Opinion Regarding Ability to do Work-Related Activities (Mental). (R. 295-98.). Dr. Llinas stated Plaintiff had poor or no mental abilities and aptitude needed to do unskilled, semiskilled, and skilled work in eighteen out of twenty tasks. The classification of poor or none means "[n]o useful ability to function in this area." (R. 295-97.) The remaining two categories which were assigned a rating of fair (seriously limited but not precluded) were Plaintiff's abilities to maintain regular attendance and punctuality within customary, usually strict tolerance, and sustain an ordinary routine without special supervision. (R. 296.) Dr. Llinas found Plaintiff had poor or no mental abilities and aptitude needed to maintain socially appropriate behavior; travel in unfamiliar places; and use public transportation. (R. 297.) He found Plaintiff had fair mental abilities and aptitudes needed to interact with the general public and adhere to basic standards of neatness and cleanliness. (R. 297.) Dr. Llinas also found Plaintiff could manage benefits in his own best interest. (R. 298.) Notably, Dr. Llinas did not support his opinions with medical or clinical findings other than to note "Bipolar illness." (R. 298.)

2. *Summary of the testimony at the administrative hearing held 1/5/2009*

Plaintiff was forty-three years old at the time of the hearing and was represented by counsel, Mark Tipton. (R. 27.) A Spanish interpreter, Ermitanio Perez, was also present. (R. 27.) At the hearing, Plaintiff primarily complained of symptoms of nervousness, being depressed and tearful, not getting along with others, and not being

able to sleep more than a few hours a night. (R. 32, 33, 34-35.)  Additionally, Plaintiff reported he sometimes goes blank and cannot remember how to do things, including while at work. (R. 39.)

Plaintiff reported that on a typical day when he is not working he locks himself in his room as an alternative to fighting with his wife and kids. (R. 33.)  He lives with his wife and three children (ages eleven, seven, and four). (R. 33, 150.)  His wife does not work. (R. 33.)

Plaintiff testified that he could dress himself, but does not always feel like showering, and sometimes his wife has to shave him because he is too nervous and does not feel well. (R.38.)  He stated his wife does all the shopping because he does not feel well enough to go out and he also does not get along with the cashiers. (R. 35, 38.)  Plaintiff stated that he does participate in social activities of any kind. (R. 35.)  However, Plaintiff reports that he occasionally attends church once a month. (R. 35.)  Plaintiff occasionally goes to family gatherings but leaves because he is uncomfortable with so many people around. (R. 35.)  He stated he does not do chores around the house because he does not "feel right" to do any chores. (R. 35.)

Plaintiff further stated that when he locks himself in his room he lies in bed or watches TV. (R. 36.)  He reported getting only three to four hours of sleep a night because his nerves prevent him from staying asleep. (R. 35-36.)

Plaintiff reported seeing a doctor, at Meridian, every month, for his mental problems and prescription refills. (R. 36.)  He advised that he was taking Zyprexa,

Lithium, and Invega.[15] (R. 34).  Plaintiff stated the medications helped, but "not too

much." (R. 34.).  Plaintiff acknowledged that if he does not drink the Imbega[16] he will

hear voices. (R. 34).

At the hearing Plaintiff testified that he did not think he would be able to do his

part-time job full-time because he already feels like not going to work. (R. 37.  Plaintiff

explained he did not feel he could work more than four hours in his current job. (R.37.)

Additionally, Plaintiff reported difficulties performing his current job.  For example, he

could not always remember how to assemble the shirt in order to iron it and he also

argued with his co-workers and the owner. (R. 37.)  He reported losing many jobs in the

past for arguing. (R. 37.)  Plaintiff stated that he has not been fired from his current job

because his brother is a friend of the owner and the owner knows about Plaintiff's

condition. (R. 39).

## VI. **DISCUSSION**

Plaintiff argues that ALJ Walker committed error at step two by ignoring the

treating physician's diagnosis of bipolar disorder.  The ALJ properly evaluated Plaintiff's

credibility and assigned little weight to Dr. Llinas' assessment.

---

[15] The hearing transcript documents Zyprexa and Lithium and an inaudible third prescription at six milligrams. (R. 34).  The claimant later mentions drinking the "Imbega (phonetic)" to stop hearing voices. (R. 34) Invega is documented in the Meridian notes from October 9, 2008. (R. 315, 316).

[16] As the medical records do not evidence an Imbega prescription, it is likely he is referring to Invega or Lithium.  However, it is more likely he is referring to the Lithium because that is his only liquid medication.

Plaintiff suggests that the error by the ALJ was at step two of the sequential analysis. Plaintiff's argument, however, misconstrues the purpose of step two and ignores the fact that the ALJ addressed Plaintiff's mental impairments as part of evaluating Plaintiff's RFC.

The purpose of the sequential analysis at step two is simply to screen out *de minimis* claims. Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d 289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989). The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

Where the ALJ makes a finding at step two that the claimant has *any* severe impairment – as the ALJ did in this case by finding Plaintiff had the severe impairments of affective disorder, anxiety disorder, and personality disorder – step two has been satisfied and the ALJ is then required to go on with the sequential evaluation. Thus, "the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987). Consequently, Plaintiff's

attempt to suggest that the challenged error occurred at step two of the sequential analysis is misplaced.

Indeed, ALJ Walker did not expressly reject the bipolar diagnosis at step two. Rather, as evidenced by the ALJ's discussion of the diagnosis in his findings he addressed Plaintiff's mental impairments at step three and as part of the residual functional capacity evaluation at step four.

Plaintiff also suggests there was reversible error because ALJ Walker misidentified the treating physician when discussing the assessment. Any error in misstating the name of the treating physician is harmless error and has nothing whatsoever to do with the substance of the ALJ's analysis.

 The ALJ identified "Dr. Theodore Pait" as the author of the assessment (R. 20) and stated that "Dr. Pait's" assessment should "not [be] given substantial weight." (R. 20.)  The author of the assessment was Dr. Jose Llinas, although it is difficult to decipher from the medical records the name of the doctor who prepared the assessment.[17] Even Plaintiff acknowledges, "'Dr. Pait' is actually just ALJ Walker misreading Dr. Llinas' handwriting below his 'J L' signature." (Doc.12 at 3).

The mistake is harmless because the ALJ correctly referenced the exhibit which contained Dr. Llinas' assessment. And the ALJ provided an accurate description of the assessment, evidencing that the ALJ relied upon the correct assessment and gave the

---

[17] Notably, it was Plaintiff's own counsel, Mark Tipton, who suggested the name Theodore Pait as the author of this document. (R. 242-43).

assessment due consideration.

The issue, therefore, is simply whether the ALJ properly evaluated Dr. Llinas'
assessment and provided reasons supported by substantial evidence for assigning little
weight to Dr. Llinas' assessment.

The law is very well defined when dealing with treating physicians. If a treating
physician's opinion on the nature and severity of a claimant's impairments is well-
supported by medically acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in the record, the ALJ must give it
controlling weight. 20 C.F.R. § 404.1527(d)(2). Nevertheless, the ALJ may discount the
treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d
1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not
bolstered by the evidence," the evidence "supports a contrary finding," the opinion is
"conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is
"inconsistent with [the treating physician's] own medical records," the statement
"contains no [supporting] clinical data or information," the opinion "is unsubstantiated by
any clinical or laboratory findings," or the opinion "is not accompanied by objective
medical evidence." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v.
Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578,
582 (11th Cir. 1987)). If an ALJ rejects a treating physician's opinion, he must give
explicit, adequate reasons for so doing, and failure to do so results in the opinion being
deemed accepted as true as a matter of law. MacGregor v. Bowen, 786 F.2d 1050, 1053

(11th Cir. 1986); <u>Marbury v. Sullivan</u>, 957 F.2d 837, 841 (11th Cir. 1992).

Substantial evidence supports ALJ Walker's decision to give little weight to Dr. Llinas' assessment because there was good cause to discount the assessment. Among the reasons for appropriately discounting the opinion of Dr. Llinas' was because the assessment was inconsistent with the other record evidence, the assessment was inconsistent with Dr. Llinas' own records, and the assessment was conclusory and not accompanied by or explained by objective medical evidence.

Dr. Llinas' assessment was extremely radical. He stated that Plaintiff has almost no ability to perform work activities. (R. 295-98.)   ALJ Walker rejected this statement because the "severity of the limitations described by Dr. [Llinas] would appear to be much more applicable to chronically psychotic individuals requiring psychiatric hospitalization or supervised living arrangements." (R. 20.).  As the ALJ noted, Plaintiff was working a part-time job, was never hospitalized, and was stable when medicated. Further, the treatment plan for Plaintiff was conservative and not aggressive, a fact which would be completely inconsistent for an individual who had "almost no ability to perform work activities."

Moreover, the decision of the ALJ to accord little weight to the extreme opinion of Dr. Llinas is supported by the evaluation of Plaintiff by state examiner Val Bee, Psy. D., who noted that "ADLs in file admit to almost no functional capabilities, a level of impairment that appears to exceed that which is shown in treatment records." (R.279.)

 The ALJ expressly stated in his decision that he considered Dr. Llinas'

assessment and found that no treating physician credibly stated Plaintiff was unable to sustain work. (R. 20.)  The ALJ appropriately noted that Dr. Llinas' assessment was conclusory and lacked any meaningful explanation for the limitations Dr. Llinas rated as "fair" or "poor." (R. 20.)  Further, Dr. Llinas' summary explanation of "Bipolar illness" in the assessment ignored the ample evidence in the treatment notes documenting that Plaintiff was stable on medication.

There was also good cause for discounting Dr. Llinas' assessment because of inconsistencies within the assessment itself.  The ALJ noted and considered the inconsistencies between Dr. Llinas' conclusion that Plaintiff could still manage benefits in his best interest and Dr. Llinas' statement that Plaintiff was unable to set realistic goals, ask simple questions or request assistance, make simple decisions, or make plans independently of others. (R. 20.)

Furthermore, the extensive treatment notes from Meridian contrast with the extreme assessment by Dr. Llinas.  For example, Plaintiff began part time employment in June 2007 and the treatment notes after Plaintiff began part time work evidence continued progress and improvement with Plaintiff's condition.  He maintained a GAF score of sixty from September 12, 2006 –  the date of his initial treatment and evaluation without medication – through March 26, 2008. Further, Plaintiff's prognosis was "fair" the beginning of his treatment (R. 257) but thereafter continued to improve, peaking to "good" in July and September of 2007.[18]  In December 2007, Plaintiff's  progress was

---

[18] (R. 245, 247, 251, 253, 304, 308, 310, 312, 314).

favorably noted to be nine of ten, in March 2008 it was noted to be seven/eight of ten, and in October 2008 Plaintiff's prognosis was five of ten.[19]  Simply put, Plaintiff's GAF score, improving prognosis and overall progress, noted during Plaintiff's treatment at Meridian, stand in stark contrast to Dr. Llinas' extreme conclusion that Plaintiff had "almost no ability to perform work activities."

In March 2008, Plaintiff reported good sleep with medications, no mood swings and no irritability.  (R. 302.)  And even though Plaintiff's progress went from good to a seven-eight rating, he reported positive progress toward goals from previous appointments and specifically reported "manageable" depression." (R. 302, 317. Indeed, the notes from Meridian contain several entries recommending that Plaintiff would benefit from steady employment, a recommendation completely inconsistent with an assessment that Plaintiff had no ability to work.

Accordingly, for these reasons, the Court concludes that there was substantial evidence of record to support the ALJ's decision to accord little weight to the assessment of Dr. Llinas.

Lastly, Plaintiff suggests that the ALJ improperly considered Plaintiff's ability to perform part-time work. According to Plaintiff, an ability to perform part-time work is irrelevant because "under the Social Security Disability system there is no percentage of disability.  People who can work 8 hours a day, 5 days a week are not disabled, and conversely, people who cannot so work, are disabled." (Doc. 12 at 7).

---

[19] (R. 300, 302, 306).

An ALJ is permitted, however, to consider work performed after the disability onset date in the credibility analysis. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir.2004) ("it was also not unreasonable for the ALJ to note that Harris's ... part-time work [was] inconsistent with her claim of disabling pain"). In this case the ALJ did just that. The ALJ considered Plaintiff's part-time work in the credibility analysis and stated:

> The claimant's assertion that he is virtually unable to do much of anything but stay in his room and watch television or sleep is not credible. Treatment notes indicate Mr. Rodriguez is able to function well when on medication. He has no significant physical illnesses or conditions that adversely affect his ability to work. It is important to note that Mr. Rodriguez works part-time. The objective medical evidence indicates he would be able to work full-time if he chose to do so.

(R. 23). Accordingly, while the ability to perform part-time work may not be dispositive of whether a claimant is disabled, it is entirely appropriate for an ALJ to consider the claimant's ability to perform part time work in making a credibility analysis of Plaintiff's subjective claims of a complete inability to do any work.

## VII. **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on February 9, 2011.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**